UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| OLDCASTLE PRECAST, INC., | Case No. 4:17-cv-00164-BLW |
| Plaintiff, | |
| *v.* | |
| CONCRETE ACCESSORIES OF GEORGIA, INC., AREVA FEDERAL SERVICES LLC, and LIBERTY MUTUAL INSURANCE COMPANY, | **MEMORANDUM DECISION AND ORDER** |
| Defendants. | |
| AREVA FEDERAL SERVICES LLC, | |
| Counterclaimant/Crossclaimant, | |
| *v.* | |
| OLDCASTLE PRECAST, INC., CONCRETE ACCESSORIES OF GEORGIA, INC., | |
| Counterdefendants, | |
| & | |
| LIBERTY MUTUAL INSURANCE COMPANY, | |
| Crossclaim defendant. | |

**INTRODUCTION**

The Court has three ripe summary judgment motions before it: Crossclaim Defendant Liberty Mutual Insurance Company's Motion for Summary Judgment, Dkt. 63; Concrete Accessories of Georgia, Inc.'s (hereinafter, "CONAC") Motion for Partial Summary Judgment, Dkt. 71; and, Oldcastle Precast, Inc.'s Motion for Partial Summary Judgment, Dkt. 72.

In addition, the Court has two ripe motions in limine: CONAC's Motion in Limine to exclude all or part of the testimony of Areva Federal Services LLC's expert, Henry Spieker, Dkt. 64; and CONAC's Motion in Limine to exclude all or part of the testimony of Oldcastle's expert, Ronald Mayville, Dkt. 67.

**BACKGROUND**

This case arises out of an accident that occurred during the construction of the Remote Handled Low-Level Waste Disposal Facility at the Idaho National Laboratory. The legal relationships between the various parties to this litigation are as follows:

1. Areva, working on behalf of the project owner, Battelle Energy Alliance, performed the role of general contractor for the construction of the Remote Handled Low-Level Waste Disposal Facility.

2. Areva entered into a Subcontract Agreement with Oldcastle (hereinafter, the "Oldcastle Subcontract"), by which Oldcastle agreed to fabricate and deliver

precast concrete vaults for the project. *See* Dkt. 72-3, Dkt. 72-4, Dkt. 72-5, Dkt. 72-6, Dkt. 72-7.

3. As part of its agreement with Oldcastle, Areva required Oldcastle to furnish a Subcontract Performance Bond. *See* Dkt. 72-9. To fulfill this obligation, Oldcastle obtained the Performance Bond from Liberty Mutual and furnished it to Areva. *Id.*

4. In addition to securing the Performance Bond, Oldcastle entered into an agreement with CONAC for the purchase of metal anchors (hereinafter, the "CONAC Agreement").[1]

## FINDINGS OF FACT

### 1. Areva Enters into the Oldcastle Subcontract

On September 14, 2015, Oldcastle and Areva entered into the Oldcastle Subcontract. Dkt. 31 at ¶ 6. In exchange for payment, Oldcastle agreed to, among other things, fabricate and deliver precast concrete vaults to a site at the Idaho National Laboratory. *Id.* The vaults were intended for use at the Remote-Handled Low-Level Waste Disposal Facility located near Scoville, Idaho. *Id.*

### 2. Oldcastle Obtains a Performance Bond from Liberty Mutual

---

[1] Pursuant to the Court's analysis below, the exact terms of the CONAC Agreement cannot be determined on the basis of the record presently before the Court. Nevertheless, the Parties do not contest that consideration was exchanged. The Court therefore concludes that an agreement between the Parties existed, though its exact terms are not known.

Shortly after Oldcastle entered into the Oldcastle Subcontract with Areva,

Oldcastle secured a Performance Bond from Liberty Mutual on September 29, 2015. *See*

Dkt. 72-9. The following portions of the Performance Bond are relevant to the dispute:

> NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if the Principal shall promptly and faithfully perform said Subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.
>
> PROVIDED AND SUBJECT TO THE CONDITIONS PRECEDENT:
> 1.0  Whenever the Principal shall be, and be declared by the Obligee to be in default under the Subcontract, the Obligee having performed the Obligee's obligations thereunder, the Surety may promptly remedy the default, or shall promptly:
> > 1.1.  Arrange for the Principal, with consent of the Obligee, to perform and complete the Subcontract; or
> > 1.2.  Undertake to perform and complete the Subcontract itself, through its agents or through independent contractors; or
> > 1.3.  Obtain a bid or bids from alternative contractors to complete the Subcontract in accordance with its terms and conditions, and upon determination by Surety of the lowest bidder, or if the Obligee elects, upon determination by the Obligee and Surety jointly of the lowest responsible bidder, arrange for a subcontract between such bidder and the Obligee …; or
> > 1.4.  Waive its right to perform and complete, arrange for completion, or obtain a new subcontractor and with reasonable promptness under the circumstances:
> > > a.  After investigation, determine the amount for which it may be liable to the Obligee and, as soon as practicable after the amount is determined, tender payment therefore to the Obligee; or
> > > b.  Deny liability in whole or in part and notify the Obligee citing reasons therefore…
> 5.0  Any claims must be presented in writing to Liberty Mutual Insurance Company, to the attention of The Surety Law Department at the above address.

*Id.* at 2-3.

### 3.  Oldcastle Enters into the CONAC Agreement

#### a. *Basic Parameters of the CONAC Agreement*

In addition to securing the Performance Bond from Liberty Mutual, Oldcastle entered into the CONAC Agreement. In exchange for payment, CONAC agreed to supply certain metal anchors to be used as part of the assembly of the precast concrete vaults that Oldcastle was assembling for Areva. *See* Dkt. 21. For demonstrative purposes only, photos of the metal anchor supplied by CONAC and the final precast concrete vault follow as Figure 1 and Figure 2, respectively.



Fig. 1: Dkt. 70 at 7.



Fig. 2: Dkt. 70 at 7.

### b. *The Contested Terms of the CONAC Agreement*

The exact contents of the CONAC Agreement are disputed. According to CONAC, the Agreement between CONAC and Oldcastle incorporated CONAC's "Terms and Conditions of Sale" which, again according to CONAC, are conspicuously posted on CONAC's website (Dkt. 74-1 at 2) and in CONAC's purchase catalog (Dkt. 74-1 at 1). The relevant portion of CONAC's "Terms and Conditions of Sale" reads as follows:

> It is the responsibility of the user to check supplied products prior to use. Any product believed to be defective should be returned to CONAC for inspection. CONAC will refund the purchase price or replace, at its election, any product which it finds to be defective, provided the product has been used properly. Such refund or replacement shall be the exclusive remedy available, and CONAC hereby disclaims any and all express or implied warranties, and excludes any liability for consequential damages, in accordance with Article 2-719 of the Uniform Commercial Code.

*Id.*

The Parties do not dispute that Michael Blackham, an engineer employed by Oldcastle who placed the order for the CONAC anchors, (1) had a copy of CONAC's catalog when he made the order and (2) accessed CONAC's website before ordering them. Dkt. 86 at 2. Oldcastle, however, argues that the "Terms and Conditions of Sale" "were [n]ever provided to Oldcastle" and were not conspicuously located on CONAC's website or in CONAC's magazine. *Id.* at 3. Mr. Blackham gave the following testimony during his deposition on this issue:

> Q. (BY MR. STUBBS [Counsel for CONAC]) Mr. Blackham, I've handed you what has been marked Deposition Exhibit 5 [Dkt. 74-1]. I'll represent to you that these are terms and conditions of sale that are published by CONAC. They are OCP 00001 and 2. One is from the website for CONAC. Another is a document they published in their catalog. Have you seen these before?
> A. No.
> Q. You have accessed the CONAC website before; correct?
> A. Yes.
> Q. And were you aware that the CONAC terms and conditions of sale were present on the website?
> A. No, I've never seen these.
> Q. And in terms of the CONAC catalog, do you have a CONAC catalog?
> A. Yes.
> Q. Have you ever looked at the terms and conditions of sale that are in there?
> A. No.

Dkt. 74.

### 4. Areva Seeks Increase in Compensation from Battelle

After construction on the Remote Handled Low-Level Waste Disposal Facility was underway, Areva sought an increase in contract compensation from Battelle. To this end, on August 9, 2016, Areva filed Baseline Change Request ("BCR") 193 (Dkt. 89-3 at

8) seeking an increase of roughly $3.25 million in contract compensation as a result of "[c]hanges requested by … [Battelle]." *Id.* BCR-193 did not include a request to alter the construction schedule. *Id.* ("There has been a schedule impact [from the project changes for which Areva was seeking additional compensation], but it has been mitigated largely be [*sic*] adding resources. We are not seeking [*sic*] change in schedule or costs for schedule delays at this time.").

### 5. The Construction Accident

On August 11, 2016, two days *after* Areva submitted BCR 193, the accident at the center of this case occurred. As Oldcastle personnel raised one of the concrete vaults into the air for purposes of placing on a flatbed truck, CONAC's metal fastener failed. Due to the shift in weight, the other two anchors failed as well, and the concrete cask then fell approximately three feet to the ground.

### 6. The Stop-Work Order and Amendment 29

One day after the accident, Battelle issued a Stop Work order "on all concrete vault component hoisting and rigging at the INL site." Dkt. 72-15 at 51. The letter accompanying the Stop Work order required Areva to provide Battelle with a "detailed … [report] including root cause of the failure, the extent of conditions of parts fabricated by Oldcastle under the referenced subcontract, and any corrective action(s) required to mitigate recurrence." *Id.* Through a series of subsequent letters over the next four months, Battelle slowly rescinded parts of the Stop Work order. *Id.* at 55-59.

During the same period, Battelle also continued to consider Areva's request for an increase in contract compensation in BCR-193. Areva's request for fees was approved, though in an amount that was less than Areva sought, in Amendment 29. Dkt. 89-4 at 5. And, even though BCR-193 specifically stated that it Areva was not seeking an extension of the completion date, Amendment 29 extended the projects completion date to September 28, 2017. *Id.* According to the sworn statement of Joe Stringer, who, at the time of the accident, was the Vice-President of Operations for Areva and was in charge of the Remote Handled Low-Level Waste Disposal Facility project, the extension of the project completion date came after Areva submitted a revised project schedule in light of the lifting accident. Dkt. 89-4 at 1. Per Mr. Stringer's Declaration, no causal link existed between the delays for which Areva was seeking extra fees in BCR-193 and the revised project schedule that was proposed by Areva after the accident. Dkt. 89-3 at 2-5.

## EXPERT REPORTS

### 1. Expert Report of Henry Spieker

In support of its claims against CONAC, Areva retained and disclosed an Expert report from Henry J. Spieker. *See* Dkt. 66. Mr. Spieker was retained in order to quantify the damages incurred by Areva as a result of, among other things, the lifting lug failure. *Id.* at 4. To quantify the delay damages incurred by Areva, Mr. Spieker first calculated the project completion rate. *Id.* An example of the Mr. Spieker's project completion rate calculation follows:

Payment application 23, which includes work completed through July 24, 2016, shows that AFS was 75% complete prior to the Lifting Lug Failure, leaving 25% ($8,660,352) of the Project to complete in 4.5 months. Leading up to the time of the lug failure, AFS completed an average of $2,430,774 per month between March and July 2016. Had AFS been able to continue the completion of the project at this pace, but for the lug and pull out failures, AFS would have completed the Project on time. This can be seen by dividing the remaining value of the project by the remaining contract time, as follows: $8,660,352 / 4.5 months = $1,924,522 per month. Therefore, at the time the Lifting Lug Failure occurred, AFS was on pace to complete the project in accordance with the revised substantial completion date, December 15, 2016.

Dkt. 66 at 7-8 (footnote omitted).

Based on this method of calculating the project completion rate, Mr. Spieker estimates that the project suffered from a delay of 286 days – one day less than the number of days that Amendment 29 added to the project completion date. Dkt. 66 at 8; Dkt. 89-4 at 5. Mr. Spieker breaks this total period of delay down into four specific categories:

    a. "Lifting Lug Failure – Lifting Re-Design" – Mr. Spieker estimates that the lifting lug failure and accompanying Stop Work order resulted in 103 calendar days of delay. Dkt. 66 at 10.

    b. "Winter Suspension" – Mr. Spieker estimates that winter conditions resulted in 96 calendar days of delay. *Id.*

    c. Anchor Pull Out[2] – Mr. Spieker estimates that the anchor pull-out and accompanying Stop Work order resulted in 33 calendar days of delay. *Id.*

    d. "Inefficiency and Additional Time Needed for New Lift Design" – Finally Mr. Spieker concludes that "AFS Project staff state that the new designs for the lifting components resulted in increased time for each lift and required

---

[2] The Court notes for purposes of clarity that this accident is separate and distinct from the August 11, 2016 anchor failure described above in the Findings of Fact section.

additional manpower. This along with work performed during winter weather caused an additional 54 calendar day delay to the Project." *Id.*

## 2. Expert Report of Dr. Ronald Mayville

In support of its claims against CONAC, Oldcastle retained and disclosed an expert report from Dr. Ronald Mayville. Dr. Mayville's report concludes that "[t]he conditions of normal lifting on the cylinder [i.e., the concrete cask] on an anchor that was brittle and contained a preexisting crack were sufficient to cause fracture of the anchor." Dkt. 70 at 14. In other words, Dr. Mayville concludes that the anchor supplied by CONAC, rather than the lifting procedure employed by Oldcastle's personnel, was the likely cause of the anchor failure and the resulting accident. *Id.*

In arriving at this conclusion, Dr. Mayville incorporates a number of assumptions. First, Dr. Mayville incorporates linear elastic fracture mechanics into this report. *Id.* at 12-13. In doing so, however, Dr. Mayville included the following language:

> The stresses we calculate for the anchor at the crack location are relatively high and may approach or exceed the failed anchor's yield strength. To our knowledge, the yield strength of the failed anchor was not measured. Nevertheless, it must be less than the tensile strength, which is approximately 100 ksi. Linear elastic fracture mechanics is not technically applicable when the stresses are of yield strength magnitude. Nevertheless, linear elastic fracture mechanics provides a good means of evaluating fracture conditions given the uncertainties in the other parameters needed for the evaluation.

*Id.* at 13. In addition to relying, in part, on linear elastic fracture mechanics in coming to his conclusion, Dr. Mayville also cites to and incorporates the work of I.S. Raju and J.C.

Newman in his analysis. *Id.* at 5, 11-12. Specifically, Dr. Mayville used Raju's and Newman's stress intensity factor solutions. *Id.*

## LEGAL STANDARD

### 1. Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis omitted). Rather, there must be no genuine dispute as to a material fact for a party to be entitled to summary judgment. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that a material fact cannot be disputed and they are therefore entitled to judgment as a matter of law. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb [through] the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific, triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978). Rather, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed.

R. Civ. P. 56(e)(2).  The Court may grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party.  Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

### 2. *Daubert* Standard

Whether and to what extent an expert may testify at trial is addressed under the well-known standard first enunciated in *Daubert* and its progeny, but now set forth in Rule 702 of the Federal Rules of Evidence.  Rule 702 establishes several requirements for permitting expert opinion.  First, the evidence offered by the expert must assist the trier of fact either to understand the evidence or to determine a fact in issue.  *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010); Fed. R. Evid. 702.  "The requirement that the opinion testimony assist the trier of fact goes primarily to relevance."  *Id.* at 564 (internal quotations and citations omitted).

Additionally, the witness must be sufficiently qualified to render the opinion.  *Id.* at 563.  If specialized knowledge will assist the trier of fact to understand the evidence or

determine a fact in issue, a witness qualified by knowledge, skill, experience, training or education may offer expert testimony where: (1) the opinion is based upon sufficient facts or data, (2) the opinion is the product of reliable principles and methods; and (3) the witness has applied those principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

The inquiry is a flexible one. *Primiano*, 598 F.3d at 564. Ultimately, a trial court must "assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* (internal quotation and citation omitted). In determining whether expert testimony is reliable and relevant, the Court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Boyd v. City and County of San Francisco*, 576 F.3d 938, 945 (9th Cir. 2009) (internal citation omitted). Finally, a review of the case law after *Daubert* reveals that exclusion of expert testimony is the exception rather than the rule. Fed. R. Evid. 702, Adv. Comm. Notes (2000).

## ANALYSIS

### 1. Liberty Mutual and Oldcastle Are Both Entitled to Summary Judgment on Areva's Claim on the Performance Bond

Because Areva failed to fulfill at least three conditions precedent required by the unambiguous terms of the Performance Bond, it cannot maintain a claim on the Performance Bond.

### a.    *Legal Standards for Interpreting the Performance Bond*

Because Areva's claim on the Performance Bond is grounded in contract law, this Court applies Idaho state law in interpreting the contents of the Performance Bond. *See Wells Cargo, Inc. v. Transport Ins. Co.*, No. 4-08-cv-00491-BLW, 2012 WL 3112009 at *3 (D. Idaho July 30, 2012). The Idaho Supreme Court has made clear that the question of whether an insurance policy[3] is ambiguous is a question of law for the court to determine. *Farm Bureau Mutual Insurance Co. of Idaho v. Schrock*, 252 P.3d 98, 102 (Idaho 2011) (citing *Cherry v. Coregis Insurance Co.*, 204 P.3d 522, 524 (Idaho 2009)).

A court must ask whether a policy is reasonably subject to conflicting interpretations in order to determine whether it is ambiguous. *Id.* If the language of the policy is clear and unambiguous, then it will be given its ordinary and plain meaning. *Id.* Where the contract is ambiguous however, "[t]o determine the meaning of an ambiguous contract, the trier of fact must determine what a reasonable person would have

---

[3] Liberty Mutual's brief, through citation of *Clark*, appears to concede that the Performance Bond at issue in this litigation is a species within the genus of insurance contracts.

understood the language to mean and the words used must be construed given their ordinary meaning." *Clark v. Prudential Property and Casualty Ins. Co.*, 66 P.3d 242, 233 (Idaho 2003).

### b. *The Parties' Arguments*

Turning to the facts of this case, the key terms of the Performance Bond are as follows:

> NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if the Principal shall promptly and faithfully perform said Subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.
>
> PROVIDED AND SUBJECT TO THE CONDITIONS PRECEDENT:
> 1.0   Whenever the Principal shall be, and be declared by the Obligee to be in default under the Subcontract, the Obligee having performed the Obligee's obligations thereunder, the Surety may promptly remedy the default, or shall promptly:
>     1.1.   Arrange for the Principal, with consent of the Obligee, to perform and complete the Subcontract; or
>     1.2.   Undertake to perform and complete the Subcontract itself, through its agents or through independent contractors; or
>     1.3.   Obtain a bid or bids from alternative contractors to complete the Subcontract in accordance with its terms and conditions, and upon determination by Surety of the lowest bidder, or if the Obligee elects, upon determination by the Obligee and Surety jointly of the lowest responsible bidder, arrange for a subcontract between such bidder and the Obligee …; or
>     1.4.   Waive its right to perform and complete, arrange for completion, or obtain a new subcontractor and with reasonable promptness under the circumstances:
>         a.   After investigation, determine the amount for which it may be liable to the Obligee and, as soon as practicable after the amount is determined, tender payment therefore to the Obligee; or
>         b.   Deny liability in whole or in part and notify the Obligee citing reasons therefore…

>5.0    Any claims must be presented in writing to Liberty Mutual Insurance Company, to the attention of The Surety Law Department at the above address.

Dkt. 72-9 at 2-3.

The Parties take three different positions with respect to what meaning should be ascribed to the foregoing language. Liberty Mutual, for its part, argues that prior to filing suit the unambiguous terms of the Performance Bond required Areva to (1) declare that Oldcastle was in default, (2) notify Liberty Mutual of Oldcastle's default, and (3) present its claim on the Performance Bond in writing to Liberty Mutual's Surety Law Department. Dkt. 63-2 at 5. Oldcastle, for its part, argues that the unambiguous terms of the Performance Bond, combined with the "Flow Down" provisions that Oldcastle and Areva agreed to in a separate document, required Areva to terminate Oldcastle prior to making a claim on the Performance Bond. Dkt. 72-1 at 11.

Finally, Areva points the Court away from the "CONDITIONS PRECEDENT" language altogether and towards the more general "CONDITIONS OF THIS OBLIGATION" section (hereinafter, the "OBLIGATION Section"). According to Areva, the OBLIGATION Section creates a duty that (1) can be enforced by a breach of contract suit and (2) is not limited by the "CONDITIONS PRECEDENT" language which immediately follows it in the Performance Bond.

### c. *The Unambiguous Terms of the Contract Preclude Areva from Maintaining a Claim on the Performance Bond*

The Court begins by noting that the plain terms of the Performance Bond require Areva to (1) "declare[]," (2) Oldcastle to be in "default," (3) by "present[ing] [any claims] in writing to Liberty Mutual Insurance Company, to the attention of The Surety Law Department." Dkt. 72-9 at 2-3. In the context of the Performance Bond, the term "declare" in its transitive form unambiguously requires Areva "to make a formal statement … acknowledging" Oldcastle's default. *Declare*, OXFORD ENGLISH DICTIONARY ONLINE, Oxford University Press, December 2018. "Default," in its noun form, is the "omission or failure to perform a legal or contractual duty." *Default*, BLACK'S LAW DICTIONARY (10th ed. 2014). Altogether, the plain terms of the Performance Bond unambiguously require, as conditions precedent to Liberty Mutual's performance, that Areva make known or state clearly in a writing to the Liberty Mutual Surety Law Department that Oldcastle omitted or failed to perform its contractual duty. *See Weisel v. Beaver Springs Owners Ass'n Inc.*, 272 P.3d 491, 500 (Idaho 2012) ("Whether a provision in a contract amounts to a condition precedent is generally dependent on what the parties intended, as adduced from the contract itself." (citation omitted)). Because Areva has not satisfied any of the conditions precedent in the Performance Bond, it may not maintain a claim on the Performance Bond.

Areva's argument that the OBLIGATION Section creates a duty that (1) can be enforced by a breach of contract suit and (2) is not limited by the "CONDITIONS PRECEDENT" language which immediately follows it in the Performance Bond is

unconvincing. First, as noted above, Areva's interpretation does not accord with the plain terms of the Performance Bond. Second, even if the Court found that Performance Bond was ambiguous, it would still resolve the dispute in Oldcastle's and Liberty Mutual's favor. It is a hornbook canon of interpretation that a general provision in a contract or statute "does not govern unless there is no more specific rule." *Cf. Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989); *see also Native Vill. of Venetie I.R.A. Council v. State of Alaska*, 944 F.2d 548, 553 (9th Cir. 1991) ("A specific congressional directive would trump the general rule."). Here, the more general OBLIGATION Section upon which Areva relies give way to the more specific "CONDITIONS PRECEDENT" language.

Third, the primary case upon which Areva relies, *L & A Contracting Co. v. Southern Concrete Servs., Inc.*, 17 F.3d 106 (5th Cir. 1994), refutes rather than supports Areva's argument that it may maintain a breach of contract suit without declaring Oldcastle to be in default. Areva repeatedly quotes the following language from that case throughout its briefs:

> Although the terms "breach" and "default" are sometimes used interchangeably, their meanings are distinct in construction suretyship law. Not every breach of a construction contract constitutes a default sufficient to require the surety to step in and remedy it. To constitute a legal default, there must be a (1) material breach or series of material breaches (2) of such magnitude that the obligee is justified in terminating the contract. Usually the principal is unable to complete the project, leaving termination of the contract the obligee's only option. The definition of "default" implicit in L & A's dictionary analogy impermissibly blurs the distinct concepts of "breach" and "default".

*L & A Contracting*, 17 F.3d at 110 (footnotes omitted). But, Areva's citation to the case ignores the sentence preceding the quoted language, which reads "L & A's proffered definition misapprehends the legal nature of the 'default' that is required *before* the obligee's claim against the surety matures." *Id.* (emphasis added). As in this case, *L & A Contracting* makes clear that performance bonds, like other contracts, must be interpreted in a way that honors conditions precedent included in the contract. *L & A Contracting* lends no support to the position that Areva may enforce the Performance Bond through a breach of contract suit prior to giving Liberty Mutual notice of Oldcastle's default and an opportunity to cure.

Fourth, Areva's argument, that the "CONDITIONS PRECEDENT" language in the Performance Bond should not be applied in this case because it would render the OBLIGATION Section superfluous, is obviously incorrect. The OBLIGATION Section in the Performance Bond sets out broad duties owed between Areva and Oldcastle. Those rights, however, are subject to, and limited by, the "CONDITIONS PRECEDENT" terms. The Court's interpretation of the contract does not render the more general OBLIGATION Section superfluous; it simply recognizes that at the time of contracting the Parties chose to limit the broad duties described in the OBLIGATION Section by imposing conditions that needed to be met prior to Areva making a claim on the Performance Bond.

In light of the foregoing, Crossclaim Defendant Liberty Mutual Insurance Company's Motion for Summary Judgment (Dkt. 63) is hereby GRANTED.[4]  Oldcastle Precast, Inc.'s Motion for Partial Summary Judgment (Dkt. 72) is also hereby GRANTED-IN-PART to the extent it argues that Areva may not maintain a claim on the Performance Bond.[5]

## 2. Issues of Material Fact Remain with Respect to Whether Areva Is Entitled to Delay Damages from Oldcastle

Although Oldcastle is entitled to summary judgment on Areva's claim on the Performance Bond, Oldcastle is not entitled to summary judgment on Areva's claim for delay damages.

### a. *The Timeline of Events*

Oldcastle and Areva put forth different interpretations of the events leading up to and after the lifting lug accident.  The Court will briefly summarize the timeline of events:

i.  On August 9, 2016, Areva submitted BCR-193 to Battelle.  BCR-193 requested an increase in the contract price to be paid to Areva to account for "[c]hanges requested by the customer." Dkt. 89-3 at 8.  Areva noted in BCR-193 that "[t]here has been a

---

[4] Liberty Mutual also argues that Areva cannot seek delay damages under the Performance Bond. Because Areva cannot maintain a claim on the Performance Bond at all, the Court will not reach the question of whether the Performance Bond allows for delay damages.

[5] Although Oldcastle is entitled to summary judgment, the Court notes that it is skeptical of Oldcastle's argument that Areva was required to terminate Oldcastle prior to maintaining a claim on the Performance Bond.  That requirement does not appear in the Performance Bond itself, and Liberty Mutual argues, to the contrary, that one of its rights in a default scenario was to continue to have Oldcastle perform the work while paying for any damages incurred by Areva due to the default.  Dkt. 63-2 at 5-6.

schedule impact [from the project changes for which Areva was seeking additional compensation], but it has been mitigated largely be [*sic*] adding resources." *Id.* BCR-193 *did not* include a request to alter the construction schedule. *Id.*

ii. On August 11, 2016, the lifting lug accident occurred. Dkt. 72-12.

iii. On August 12, 2016, Battelle issued a Stop Work order "on all concrete vault component hoisting and rigging at the INL site." Dkt. 72-15 at 51.

iv. *After* the accident and accompanying Stop Work order, Areva submitted a revised construction schedule to Battelle. Dkt. 89-4. The run date on the revised schedule was December 13, 2016. Dkt. 89-4 at 5.

v. On December 19, 2016, Areva and Battelle executed Amendment 29 which (1) increased Areva's compensation to complete the project pursuant to BCR-193 and (2) revised the project completion date to September 17, 2017. *Id.*

vi. The project was "substantially complete[d] by the end of September 2017." Dkt. 72-1 at 6.

**b. *Issues of Material Fact Remain Regarding Whether the Accident Caused a Delay in the Completion of the Project***

From this series of events, Oldcastle argues that the project was already significantly delayed prior to the submission of BCR-193 due to Areva's miscalculation of the resources required to finish the project. Dkt. 72-1 at 4. Oldcastle then asks the Court to conclude that, fortuitously, the project completion date was revised to September 17, 2017, which, in essence, created a buffer period so that the lifting-lug accident did not end up delaying the project. *Id.* at 6-8.

Areva argues for a different interpretation of the timeline of events. According to Areva, BCR-193 did not include a request for a project extension. Dkt. 89 at 4. To the contrary, Areva asserts that no extension was needed because Areva had made up for the unexpected difficulties encountered during the period preceding the submission of BCR-193 by dedicating additional resources to the project. *Id.* It was only *after* the lifting lug accident and Battelle's issuance of the Stop Work order that Areva submitted a request for an extension of the project deadline. According to Areva, no inference can be drawn from the fact that Amendment 29 both (1) increased Areva's compensation to account for delays in construction prior to BCR-193's submission and (2) extended the project deadline. Dkt. 89-1 at ¶ 5 ("Purely as a result of timing, Amendment No. 29 reflected both the contract price adjustment requested in BCR-193 and the separate schedule adjustment necessitated by the lifting-lug failure.").

At a minimum, the Parties' conflicting interpretations of the timeline of events both prior to and after the accident shows that summary judgment is inappropriate. While the Court need go no further, it will note that Oldcastle's position strains credulity. It is unlikely that a major accident on a job site resulting in a Stop Work order would not delay the project's completion date. In any event, that factual question must be left for the jury. Oldcastle Precast, Inc.'s Motion for Partial Summary Judgment (Dkt. 72) is DENIED to the extent it seeks to preclude Areva from seeking delay damages.

### 3. Issues of Material Fact Remain with Respect to Whether CONAC's "Terms and Conditions of Sale" Are an Enforceable Part of CONAC's Agreement with Oldcastle

The Court now turns to CONAC's Motion for Partial Summary Judgment. Dkt. 71. In its motion, CONAC argues that its "Terms and Conditions of Sale" entitled it to summary judgment on Oldcastle's claims. Though the Parties briefing largely skips straight to the question of whether CONAC's "Terms and Conditions of Sale" were compliant with the requirements for warranty disclaimers set out by the Idaho UCC, the Court is required to first answer another question: were the "Terms and Conditions of Sale" part of the agreement between CONAC and Oldcastle in the first instance? Under Idaho's UCC provisions, "[p]arties to a contract must have a mutual understanding or meeting of the minds regarding essential contract terms in order for the contract to be binding." *Figueroa v. Kit-San Co.*, 123 Idaho 149, 156 (Ct. App. 1992); *see also* Idaho Code 28-2-204. "In order to have an enforceable contract, the UCC does not require a document itemizing all the specific terms of the agreement." *Paloukos v. Intermountain Chevrolet Co.*, 99 Idaho 740, 743 (1978). But, summary judgment is inappropriate where there are issues of material fact with respect to open terms in the agreement reached by the parties. *Id.*

Given that neither party directly briefed this issue, the answer to the question posed by the Court is unclear. The Parties agree that Oldcastle entered into a purchase agreement with CONAC for the metal anchor at issue in this case on October 3, 2015.

Dkt. 71-1 at ¶ 2; Dkt. 21 at ¶ 8. According to CONAC, Michael Blackham, an engineer employed by Oldcastle who purchased the metal fastener that failed, had access to a CONAC catalog that had the "Terms and Conditions of Sale" included in it. Dkt. 71-1 at ¶ 2. Additionally, the "Terms and Conditions of Sale" were apparently included on CONAC's website (Dkt. 74-1 at 2), which Mr. Blackham accessed prior to ordering the metal anchor (Dkt. 71-1 at ¶ 2). CONAC has not provided (1) a copy of the purchase agreement between it and Oldcastle or (2) briefed how Mr. Blackham went about negotiating the contract and purchase of the metal anchors. Instead, CONAC flatly assets that "[a]s part of … [the purchase] agreement, Oldcastle agreed to CONAC's 'Terms and Conditions of Sale' included in its catalog and on its website." Dkt. 71-1 at ¶ 2.

For its part, Oldcastle "disputes that the 'Terms and Conditions of Sale' were part of its purchase agreement with CONAC." Dkt. 86-1 at ¶ 1. In support of this assertion, Oldcastle relies on the following deposition testimony from Michael Blackham:

> Q. Mr. Blackham, I've handed you what has been marked Deposition Exhibit 5. [Dkt. 74-1]. I'll represent to you that these are terms and conditions of sale that are published by CONAC. They are OCP 00001 and 2. One is from the website for CONAC. Another is a document they published in their catalog. Have you seen these before?
> A. No.
> Q. You have accessed the CONAC website before; correct?
> A. Yes.
> Q. And were you aware that the CONAC terms and conditions of sale were present on the website?
> A. No, I've never seen these.
> Q. And in terms of the CONAC catalog, do you have a CONAC catalog?
> A. Yes.
> Q. Have you ever looked at the terms and conditions of sale that are in there?

A. No.

Dkt. 74.

On this record, the Court cannot determine if the "Terms and Conditions of Sale" were part of the CONAC Agreement. Critical information including the actual purchase agreement and the process Mr. Blackham went through in placing the order is missing from the record. Assuming Mr. Blackham ordered the parts online, there is no record of any discussion of whether the "Terms and Conditions of Sale" were browsewrap or clickwrap. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014) (holding with respect to browsewrap agreements that "where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice"). As such, the issue of whether the "Terms and Conditions of Sale" are part of the CONAC Agreement is "a question of fact for the trier of fact to resolve." *Inland Title Co. v. Comstock*, 779 P.2d 15, 16 (Idaho 1989).[6] Accordingly, CONAC's Motion for Partial Summary Judgment (Dkt. 71) is DENIED.

---

[6] With respect to the arguments put forth by Oldcastle and CONAC regarding the conspicuousness of the "Terms and Conditions of Sale" and whether the remedy provision in the "Terms and Conditions of Sale" is unconscionable or fails its essential purpose, the Court will make a determination on those issues closer to trial.

### 4. Both Expert Reports that CONAC Seeks to Exclude Are Admissible

The Court begins by noting that the exclusion of expert testimony is the exception rather than the rule. Fed. R. Evid. 702, Adv. Comm. Notes (2000). Furthermore, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (citation and quotation marks omitted). Where there are questions about the factual basis of an expert's opinion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. Wells*, 879 F.3d 900, 933 (9th Cir. 2018) (citation and quotations omitted).

#### a. *Mr. Spieker's Expert Report Is Admissible*

Mr. Spieker filed a report which primarily deals with calculating the delay damages allegedly suffered by Areva. CONAC makes three arguments regarding why Mr. Spieker's report should be excluded. First, CONAC argues that Mr. Spieker failed to account for other sources of delay and, as a result, has overestimated to delay that CONAC is responsible for. Dkt. 64-1 at 6-7. Second, CONAC contends that Mr. Spieker's method of calculating the delay is unreliable. *Id.* at 7-10. Third, CONAC argues that Mr. Spieker's calculation of the 54-day delay for "Inefficiencies and

Additional Time Needed for New Lift Design" is purely algorithmic and lacks any basis in the facts. *Id.* at 10-12.

With respect to the first argument, CONAC itself concedes (Dkt. 64-1 at 7), and the Court agrees, that Mr. Spieker's alleged failure to account for additional sources of delay is an inappropriate basis to exclude Mr. Spieker's report. CONAC will have ample time during its cross examination of Mr. Spieker and in its affirmative case to point out factual deficiencies in his report. *See Wells*, 879 F.3d at 933 (holding that factual deficiencies in expert reports are issues to be raised a trial).

As for CONAC's second and third arguments, both of which are rooted in the reliability of Mr. Spieker's methods, the Court finds that Mr. Spieker's report satisfies *Daubert's* and Rule 702's reliability inquiry. Although Mr. Spieker could not specifically name another expert who used his exact method of calculating the project rate, Mr. Spieker did testify that the use of "project controls in the industry, in terms of measuring progress and using that to validate schedules, … [is] a pretty common tool, both in terms of measuring progress as well as estimating project durations." Dkt. 92-3 at 51:12-17.

As a practical matter, Mr. Spieker's calculation is logical. By adducing the total project cost, and then dividing that number by the average monthly project outlay, Mr. Spieker was able to come up with a rough estimate of when the project should have been completed but for the lifting lug accident. CONAC may very well be correct that Mr.

Spieker's method, which is only an approximation, gave an inaccurate result because he failed to account for real world conditions that effect the underlying variable in his formula. But, absolute accuracy is not required by *Daubert* or Rule 702. If it were, very few experts would be allowed to testify at trial. Mr. Spieker's method is sufficiently reliable for the evidence to go before the jury.[7] *See, e.g.*, *Weitz Co. v. MH Washington*, 631 F.3d 510, 528 (8th Cir. 2011) (affirming the admission of expert testimony regarding potential project delays even where the testimony had "apparent weaknesses" due, in part, to the expert's failure to rigorously delineate between critical path and non-critical path activities). CONAC's Motion *in Limine* to exclude all or part of the testimony of Areva Federal Services LLC's expert, Henry Spieker, Dkt. 64, is DENIED.

### b. *Dr. Mayville's Expert Report Is Admissible*

Dr. Ronald Mayville was retained by Oldcastle to evaluate the cause of anchor failure. He concluded that the anchor supplied by CONAC, rather than the lifting procedure employed by Oldcastle's personnel, was the likely cause of the anchor failure and the resulting accident. Dkt. 70 at 14. Like its motion regarding Mr. Spieker's report, CONAC lodges a number of objections to Dr. Mayville's report. Specifically, CONAC argues that Dr. Mayville's report and methods are unreliable because he improperly

---

[7] For similar reasons, the Court is unpersuaded by CONAC's argument that Mr. Spieker's testimony should be excluded under Federal Rule of Evidence 403. CONAC may re-raise this objection at trial if it so desires.

(Continued)

relied on "linear elastic fracture mechanics. Dkt. 67-1 at 6. CONAC asserts that Dr. Mayville applied "linear elastic fracture mechanics" despite conceding in his report that such reliance was not appropriate. *Id.* at 6-7.[8]

The Court is unpersuaded that Dr. Mayville's use of "linear elastic fracture mechanics" makes his report unreliable. Dr. Mayville's report concedes that "linear elastic fracture mechanics" is not technically applicable to the present case, but then concludes that the combination of the limited inferences that can be drawn from applying "linear elastic fracture mechanics" and all of the other evidence in the case reliably supports the conclusion that the brittleness of the anchor was to blame for the accident. Dkt. 87-1 at 7. CONAC reads out the fact that Dr. Mayville relied on *other evidence* in arriving at his conclusion and asks the Court to find that Dr. Mayville relied exclusively on "linear elastic fracture mechanics." This argument is contradicted by Dr. Mayville's report, however. In short, Dr. Mayville concluded that a simplified analysis incorporating "linear elastic fracture mechanics" was sufficient to adequately support his conclusion in combination with all of the other evidence he had reviewed. Ultimately, a jury will determine whether Dr. Mayville's decision to rely on a simpler, and admittedly

---

[8] CONAC contests, in the Procedural History section of its brief, Dr. Mayville's reliance on Raju's and Newman's stress intensity factor solutions. Dkt. 67-1 at ¶ 7. That argument does not appear in the Argument section of CONAC's motion however. Furthermore, similar to CONAC's argument that "linear elastic fracture mechanics" are not an appropriate for Dr. Mayville to consider, the Court is unconvinced that Dr. Mayville's incorporation of Raju and Newman's stress intensity factor solutions into his analysis impacts the reliability of his study.

less accurate, measure was the correct choice.  CONAC's Motion *in Limine* to exclude all or part of the testimony of Oldcastle's expert, Dr. Ronald Mayville, Dkt. 67, is hereby DENIED.

## ORDER

Accordingly, it is hereby ORDERED:

1. Crossclaim Defendant Liberty Mutual Insurance Company's Motion for Summary Judgment (Dkt. 63) is GRANTED.  A separate judgment, pursuant to Federal Rule of Civil Procedure 54, will accompany this Memorandum Decision and Opinion.

2. Oldcastle Precast, Inc.'s Motion for Partial Summary Judgment (Dkt. 72) is GRANTED to the extent it argues that Areva may not maintain a claim on the Performance Bond.

3. Oldcastle Precast, Inc.'s Motion for Partial Summary Judgment (Dkt. 72) is DENIED to the extent it seeks to preclude Areva from seeking delay damages.

4. CONAC's Motion for Partial Summary Judgment (Dkt. 71) is DENIED.

5. CONAC's Motion *in Limine* to exclude all or part of the testimony of Areva Federal Services LLC's expert, Henry Spieker, Dkt. 64, is DENIED.

6. CONAC's Motion *in Limine* to exclude all or part of the testimony of Oldcastle's expert, Dr. Ronald Mayville, Dkt. 67, is DENIED.



DATED: January 31, 2019

B. Lynn Winmill
U.S. District Court Judge